## Gearhart, Appellant, v. Gwinn.

*Mines and mining—License to mine coal—Revocation of license—Notice —Mailing notice.*

A licensor of coal testified in an action of ejectment that he mailed to the licensee the following notice: "You will do nothing further in the coal matter. I refer to the written license I gave you to mine certain coal under land bought by me at sheriff's sale as the land of C. The written license in question gave me the authority to terminate the contract at my option and I now terminate it. It may be, when I see you, that we can come to satisfactory arrangements for the future, but, under the present circumstances and conditions, I desire the contract to be at an end." The licensee claimed that he had never received the notice. It appeared that nothing was done under the license for more than four years after the date of the notice. The notice was offered for the purpose of establishing the fact that it had been given, but the offer was rejected. *Held*, (1) that the notice was sufficient to terminate the license notwithstanding the use of the word "desire;" (2) that the question whether the notice was received was, under all the circumstances, for the jury; (3) that the fact that there had been no work done for more than four years after the date of the notice was an important circumstance tending to show that the licensee had abandoned the property; (4) that the copy of the notice offered in evidence for the purpose stated, was properly rejected.

Where an issue turns upon whether a license to mine coal was in proper form and properly given, the question as to what money was expended by the licensee in the development of the mine, is not relevant, if it appears that this expenditure was a necessary incident of the license.

*Mines and mining—Coal lease—Revocation of lease—Expert—Evidence.*

Where a lessor in a mining lease reserves the right to terminate the lease, whenever in his opinion, "the lessees failed to use due diligence in mining said coal," the lessees cannot after the lease has been terminated by notice, set up the opinion of an expert as against that of the lessee, that due diligence had been used in mining the coal.

Argued May 7, 1906. Appeal, No. 81, April T., 1906, by plaintiff, from judgment of C. P. Cambria Co., Dec. T., 1902, No. 278, on verdict for defendants in case of S. C. Gearhart and S. D. McCartner v. Luther Gwinn and Thomas Gwinn. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Reversed.

Ejectment for coal in Read township. Before O'Con-
nor, P. J.

The facts are stated in the opinion of the Superior Court.

At the trial the court admitted G. B. Kuhn to testify, under
objection, as to the amount of expense incurred in developing
the opening of the mine or drift, which testimony, objection
and ruling of the court thereon are as follows:

" Q. Can you state how much expense you incurred in the
work of developing that opening?"

Objected to as being irrelevant and immaterial.

The Court: The objection is overruled, an exception noted
and bill sealed for plaintiffs. [7]

" A. Yes, sir; $325 without my own work and that of my
partner; I paid that out in money, cash."

Counsel for plaintiffs moved to strike out all the testimony
in relation to the cost and expense which Kuhn & Gwinn
claimed they were at in connection with the action of tres-
pass brought by Elmer Edmiston, to No. 219, March Term,
1897, it being disclosed from the declaration or statement of
claim in that case that the allegation and foundation of the
claim in that suit were based upon the alleged trespass of the
property of Elmer Edmiston. If that be true, it would have
no application to the operations upon this particular property,
and for that reason we would move to exclude from this case
all the testimony bearing upon the question of cost and ex-
pense incident to that trespass and the proceedings had there-
under.

Motion refused, exception noted and bill sealed for the plain-
tiffs. [8]

G. W. Turley, witness on stand. " Q. Do you know the
location of these two pieces of coal leased, the eight-acre piece
and the thirty-acre piece? A. Yes, sir. Q. State whether or
not they adjoin? A. Yes, sir. Q. Do you know whether or
not there had been mining operations previously conducted?
A. I do know that it was an abandoned mine; that the coal
under this property was worked out, there being nothing there
but props, pillars and stumps."

Objected to.

Mr. Kittell: We propose to prove by the witness on the
stand that the main body of coal contained in the two pieces

of land described in the writ in this case had been previously mined and removed by the Great Bend Coal Company, or some other operator, and that the only coal left available for mining was crop coal, pillars and props ; also that by reason of the location of these two pieces of land and of the improved property along the base of the hill—the buildings, cultivation of lands and private ownership of lands—that the only place where coal could be mined would be upon property owned by the party himself ; in order to have an operation of the ̄coal on this land the present operator must be the owner of the land itself, and that it was impossible to mine any coal from these two pieces of land from the Van Scoyoc land adjoining, because of the pillars having been driven and the mine allowed to fall in. This for the purpose of showing, in support of our allegation in our answer, that the defendants used due diligence in the mining operations, and that as soon as it was possible for them to obtain a place to make an opening they did so.

Counsel for plaintiffs objected to the offer for the reasons :

1. That the same is irrelevant, immaterial and incompetent.

2. That the contract in writing between Judge Bell and G. B. Kuhn and Grant Kuhn specially provided that no stumps or no pillars shall be mined from this property without having obtained the written consent of the lessor.

3. That the difficulty as to making an opening upon this property is not such a matter as would excuse the defendants in this case, or the persons under whom they claimed to hold the coal in question from pursuing their mining operations with due diligence.

4. That the testimony of the defendants shows that for a period of more than four years no operation or attempted operation was made upon this property for the purpose of mining and removing the coal, and it, therefore, becomes a question of law for the determination of this court as to whether due diligence was exercised.

The Court: Due diligence, like ordinary care, depends upon the circumstances, and while there may be some matters in this offer that are not necessary in order to support the allegation of due diligence, we think that the circumstances surrounding the situation, the difficulty of mining, and unforeseen matters would have some bearing upon the question as to

whether or not the defendants made an honest effort to comply with the terms of the lease and would affect the right of the lessor to terminate the lease under the terms of the written contract. We, therefore, overrule the objection, note an exception, and seal a bill for the plaintiffs. [9]

[The question of due diligence we propose to submit to you; you are to determine that fact from all the circumstances, as shown by the evidence in the case. Notwithstanding that clause in the agreement, Judge Bell could not arbitrarily declare the contract at an end; he would have the right to do so if those persons were not properly mining the coal, or if they were not working at it; but the question was for him if they were found guilty of acts, which, under the terms of the agreement, forfeited their rights. If Judge Bell did not see fit to exercise the option the agreement would still be in force at the time he transferred his interest, in 1902, to the plaintiffs in the case, and if it was in force then it would be in force yet, because there had been no action taken which would forfeit it since that time.] [1]

[There is one other matter which is argued by counsel for defendants in support of the position that they were not bound by any action of Judge Bell's and that the agreement was not canceled, and that is this, that Judge Bell, in his notice or letter, even though it had been received, does not indicate that he takes the action which he declares he takes in that notice or letter, for the reasons that he is authorized to take it, but merely that he desires to annul the contract. If that is all you find is contained in the notice—if that is all the notice they would receive—then that would not be sufficient because he had no right to terminate the contract if they were doing all they were required to do under the contract.] [2]

Plaintiffs presented this point:

4. It appearing from the evidence that Hon. Martin Bell gave notice that he desired to exercise his option to terminate and end the lease of November 16, 1896, prior to the institution of the present action, and that the defendants having been informed or notified of such intention the verdict should be in favor of the plaintiffs. *Answer:* If Judge Bell exercised his option under the lease for the reasons mentioned therein authorizing him to do so, and the lessees had notice of it, then

the lease was canceled and your verdict would be for the plaintiffs and with that explanation we say, if there was no lease, or no notice of the existence of any lease at the time McCartney took the title from Judge Bell, you will find for the plaintiffs. [3]

6. If the jury believe from all the evidence that the lessee or the defendants in this suit failed or neglected to mine the coal, which is the subject-matter of the present suit, for a period of more than four years, they would be warranted and justified in finding that there was an abandonment of said lease, and in that case the verdict should be for the plaintiffs. *Answer :* We do not regard that statement as applicable to this case, for the reason that Judge Bell reserved the right to terminate the lease for certain reasons. If he did not see fit to do so then no one had a right to complain. If he did not choose to exercise the option, but waived the right which he had of exercising the option, though the lessees had not acted and lived up to the agreement, then the agreement was not forfeited or canceled, and we cannot affirm the point as applicable to this case. [5]

8. The evidence showing that an opening was eventually made in 1902 on the Hopkins lot, which is a part of the Great Bend Coal Company property, by the defendants, that is conclusive proof of the fact that it was practicable to make such an opening there in 1896 and 1897, at which time defendants had an absolute right to make the opening thereon. *Answer :* We think they had a right to make that opening ; of course, a question of damages was involved, and, unless it was a question of means, they could have made it as well in 1897 as in 1902. We recollect that one of the defendants states that it was a question of means with them at the time. You will consider that as bearing upon the question of whether or not there was any notice and as bearing upon the question of the intention of the parties. [6]

Verdict and judgment for defendants. Plaintiffs appealed.

*Errors assigned* were (1, 2, 3, 5, 6) above instructions, quoting them ; (7–9) rulings on evidence, quoting the bill of exceptions.

*John E. Evans,* with him *Alvin Evans* and *F. A. Shoemaker,* for appellant.—The court below erred in submitting to the jury

the question of due diligence. The interpretation of the contract, being in writing, was for the court : Watson v. Blaine, 12 S. & R. 131.

The court below also erred in that part of its general charge which is made the subject of the second specification of error, in which it is held that the form of the notice was insufficient to convey to the lessees the purpose of the lessor : Dick v. Ireland, 130 Pa. 299.

*M. D. Kittell,* for appellee.—Equity will not permit a party to take advantage of a contract after a long course of dealing contrary to its terms without notice that thereafter he intended to enforce his rights : Cogley v. Browne, 11 W. N. C. 224 ; Wanamaker v. McCaully, 11 W. N. C. 450 ; Times Co. v. Siebrecht, 11 W. N. C. 283 ; Oliver v. Brophy, 18 W. N. C. 427 ; Newman v. Rutter, 8 Watts, 51.

The party claiming to enforce a forfeiture must exercise his right promptly, and it must not be unconscionable : Westmoreland, etc., Nat. Gas Co. v. DeWitt, 130 Pa. 235 ; Thompson v. Christie, 138 Pa. 230 ; Lynch v. Gas Co., 165 Pa. 518 ; Steiner v. Marks, 172 Pa. 400 ; Drake v. Lacoe, 157 Pa. 17 ; Duffield v. Hue, 129 Pa. 94.

The right of re-entry might have been enforced upon breach of the condition in the deed, if done at once or within a reasonable time ; but the condition being subsequent, if the breach was acquiesced in by the grantor, and valuable improvements made, a forfeiture of the estate after long delay will not be permitted : Lehigh Coal, etc., Co. v. Early, 162 Pa. 338 ; Fidelity Ins., etc., Co. v. Fridenberg, 175 Pa. 500.

Where there has been indulgence on both sides, one party cannot suddenly rescind without notice to the other : Hatton v. Johnson, 83 Pa. 219.

It is seldom that equity will enforce a forfeiture even in a clear case, and never in a doubtful one : Wick v. Bredin, 189 Pa. 83 ; Murray v. Iron Hall, 9 Pa. Superior Ct. 89.

There was evidence tending to show that the letter written by Judge Bell, even if mailed, was not received. The courts have decided that it is not the sending but the receipt of a letter that constitutes notice : McSparran v. Insurance Co., 193 Pa. 184 ; Tanner v. Hughes et al., 53 Pa. 289 ; First Nat.

Bank v. McManigle, 69 Pa. 156 ; Kenney v. Altvater, 77 Pa. 34.

OPINION BY BEAVER, J., February 25, 1907 :

A careful analysis of the facts of this case, which are not sufficiently stated by the appellants in their history to give a complete understanding of it, will make easy the application of the few simple legal principles involved.

The action is ejectment for " the coal known as the 'Great Bend coal seam or vein ' in and under " two pieces or parcels of land purchased, on December 5, 1894, at sheriff's sale by the Hon. Martin Bell, the surface of which was conveyed by the said Bell to Frederick Bland on May 25, 1899. The coal described in the deed to him as " all that certain vein or seam of coal formerly worked by the Great Bend Coal Co.," was conveyed, February 19, 1902, by the said Bell to S. D. McCartney, one of the plaintiffs, who sold the one-half part thereof, by articles of agreement, to Gearhart, the other plaintiff.

Prior to any of these conveyances, however, Bell had agreed with G. B. Kuhn and Grant Kuhn, by articles of agreement dated November 18, 1896, to " sell any coal which may remain in the vein formerly mined by the Great Bend Coal Company under " the two tracts of land above mentioned. In the said agreement, after providing for the · manner in which payment should be made, it is agreed : " Should default be made in such payments, or should said party of second part, in the opinion of said Bell, fail to use due diligence in mining said coal, then, at the option of said Bell, this agreement to be null, void and at an end." The interest of the Kuhns under this agreement became, by sundry assignments, vested in the defendants.

The question, therefore, in the case was whether the plaintiffs acquired title to the coal in controversy under their deed, or whether the defendants, under the agreement with the Kuhns, had title thereto.

It appears from the testimony that, after the Kuhns had commenced operations under the lease with Bell, it was discovered that their opening was on the land claimed by one Edmiston. After this discovery, the fact was communicated to Bell by his lessees, who directed them, in case their operations were interfered with by ·the sheriff, to cease, and that he would satisfy the docket.

The summons in an action of trespass, brought by Edmiston against Kuhn and other defendants, was served January 27, 1897. The case, as appears by the "paper of settlement" in evidence, was settled December 13, 1897.

On January 6, 1898, as appears by the testimony, Bell mailed to G. B. Kuhn a letter, dated January 5, 1898, addressed to Mountaindale, his regular post office, in which Kuhn was notified that Bell would exercise his authority to terminate the written lease to mine the coal under the property of the Great Bend Coal Co., which he had purchased at sheriff's sale.

No effort seems to have been made by the Kuhns, or their assignees, to resume the mining of coal upon the said premises until in the latter part of 1902 (about six months after the sale to McCartney), when Gwinn, the assignee of the Kuhns, having purchased a lot of ground adjoining the property purchased by Bell, made an entry on it from which the coal in the leased property could be reached.

In the notice of January 5, 1898, sent by Bell to G. B. Kuhn, after referring to the fact that he will not be able to get over to Mountaindale before the middle of February, he says: "In the meantime, you will do nothing further in the coal matter. I refer to the written license I gave you to mine certain coal under land bought by me at sheriff's sale as the land of the Great Bend Coal Company. The written license in question gave me the authority to terminate the contract at my option and now I terminate it. It may be, when I see you, that we can come to satisfactory arrangements for the future, but, under the present circumstances and conditions, I desire the contract to be at an end."

In reference to this notice, G. B. Kuhn, to whom it was addressed, in answer to this question, "Will you please state whether you received a letter from Judge Bell, bearing date January 5, 1898, or any other date, giving you notice that he terminated the contract of November 18, 1896, said: A. I do not ever remember of getting any letter. It may have been given, but I never got it. Q. During that month of January, 1898, how much of the time were you at home? A. I was at home about every Saturday night during that time. Q. When would you return to your work? A. On Monday morning; sometimes Sunday afternoon or Sunday

evening. Q. I show you a letter which Judge Bell says is a copy of the letter which he mailed to you on the 6th day of January (letter bearing date January 5, 1898); look at that letter, read it. A. I never got the letter." On cross-examination, the witness said: "Q. Did you read this (referring to the copy)? A. Yes, sir. Q. Who is it addressed to? A. G. B. Kuhn. Q. By whom? A. By Martin Bell. Q. And you think it is your recollection that you did not receive the letter? A. That is my recollection, that I never received it." Later, on re-examination, the witness said: "I can make a positive statement, I never received any such letter as that."

The facts in regard to the sending and the failure to receive this letter play an important part in the case and the testimony relating thereto has, therefore, been very fully set forth.

Three of the assignments of error relate to the agreement of Bell with the Kuhns for the lease of the coal and the notice based thereon above referred to, which raise two questions: first, whether or not Judge Bell had the power, under the lease, to terminate the rights of the lessees thereunder, and, second, whether or not the notice was an actual determination of the lease.

In view of the fact that the suit with Edmiston was settled December 13, 1897, and that no effort had been made by the Kuhns during the pendency of the suit and after its settlement, up to the date of the notice—January 5, 1898—to attempt to mine the coal, there can be no doubt, it seems to us, of the right of Judge Bell to terminate the contract under the option which he reserved therein.

Was the notice which he sent by mail sufficient in itself to terminate the contract? The court left it to the jury to say whether or not the notice actually had that effect, because, although it stated in positive terms, "In the meantime, you will do nothing further in the coal matter. I refer to the written license I gave you to mine certain coal under land bought by me at sheriff's sale as the land of the Great Bend Coal Company. The written license in question gave me authority to terminate the contract at my option and I now terminate it," it ended by saying, "I desire the contract to be at an end." The court left it for the jury to say whether or not he did actually annul the contract by this notice, because of the use of the

word " desire." Taking the notice as a whole, there can be
no question as to the effect of it, and the court, the paper being
in writing, should have construed it and given positive in-
struction to the jury as to its meaning, as to which there is no
doubt.

The notice was positive in its language and as to the inten-
tion of the lessor, and the phrase " I desire the contract to be
at an end " does not in any way qualify the positive language
previously used ; indeed, if there had been no other language
used except this latter sentence, it would have been completely
effective. In a somewhat similar case : Dick v. Ireland, 130
Pa. 299, in which the opinion was written by the present chief
justice, it is said : " ' We wish to cancel ' imports nothing in
the nature of a request for consent, or deference to the views
of the other party. It announces, though in civil phrase, the
intention of the writer to exercise his right reserved to him,
' as per contract,' and it does so with a certain appropriateness
of language, as, under the agreement, the rescission is not im-
mediate, but is to take effect at the expiration of thirty days.
Again, the subsequent phrase, ' You will please return our
bond,' is not a request, as the master views it. ' You will re-
turn our bond,' would certainly be an order, not a request, and
there is no difference between the two, except in politeness of
phraseology. It is entirely clear that this letter was an absolute
and complete rescission of the agreement." So here, there is
no difference between the phrase, " I desire the contract to be
at an end," and the more formal and decided phrase previously
contained in the notice, " The written license in question gave
me the authority to terminate the contract at my option, and
I now terminate it." Politeness of phrase, the meaning being
clear, should not militate against the party using it.

The only question of fact for the jury in this part of the case
was as to the receipt of the notice of the termination of the
lease. There may be a question for the jury as to this, under
proper instructions, as to the presumptions both of law and
fact which arise under all the circumstances attending it. A
letter having been shown to be properly mailed, the law pre-
sumes its receipt, unless the contrary appears. If it was deliv-
ered by the post office authorities to anyone who was in the
habit of receiving G. B. Kuhn's mail, it would be a delivery to

him, although he may not, as a matter of fact, have read the notice.

Another important circumstance bearing upon the subject was the fact that nothing was done under the lease for more than four years after the date of the notice. In the meantime, Judge Bell had sold the coal to one of the plaintiffs. In view of the long delay, not to say neglect, of the Kuhns to do anything under the provisions of their lease, did not Bell have the right to assume that his notice had been received and that, in accordance with its terms, the Kuhns had surrendered their rights thereunder and abandoned the property?

The first three assignments of error, which are more or less closely connected with each other and with the questions above stated, as to the right of Judge Bell to terminate the lease under the circumstances, and as to the sufficiency of the notice under which he sought to terminate it, are all sustained.

The fourth assignment of error relates to the admission in evidence of a letter written by Judge Bell, October 1, 1902, in which the notice to terminate the contract with the Kuhns is recited. This was offered for the purpose of establishing the fact that notice had been given. It was not competent for that purpose. Judge Bell was on the stand as a witness and had testified as to the facts relating to that notice. The letter was nothing more than a declaration on his part that the notice had been given. It was properly rejected.

The answer of the court to the plaintiffs' sixth point for charge, complained of in the fifth assignment of error, seems to assume that the notice of forfeiture, heretofore referred to in connection with the first three assignments, was not an unequivocal exercise of Judge Bell's option to terminate the lease. We think the point should have been affirmed without qualification, as should also the eighth point for charge, the answer to which is complained of in the sixth assignment of error. Whether or not the Kuhns, or those claiming under them, had the means to carry on the operation had nothing whatever to do with the right of Judge Bell to terminate the lease at his option.

As to the seventh and eighth assignments, the money expended by the Kuhns, or those claiming under them, in the development of the mine, does not seem to us relevant to the

issue. This expenditure was a necessary incident of the lease. Edmiston's interference with their operations was not a material fact bearing upon the issue, because, as seems to be admitted on all hands, that was amicably arranged. The testimony of G. B. Kuhn, therefore, admitted under objection, should either have been rejected, or, after it was admitted, should have been stricken out, in accordance with the motion made by the plaintiffs. The seventh and eighth assignments are, therefore, also sustained.

We are also of opinion that the testimony of the witness Turley was not competent evidence under the defendants' offer. The effect of it is to allow the testimony of an expert as to whether or not the mining of the coal, provided for in the lease between Bell and the Kuhns, had been pursued with due diligence. This was not the question in the case, or at least if it entered into the case, the question was to be determined by Judge Bell himself, in pursuance of the right which he had reserved to terminate the lease, whenever, in his opinion, " the lessees failed to use due diligence in mining said coal." The admission of the testimony complained of, therefore, in the ninth assignment, in the view which we have taken of the case, was erroneous, and it should have been rejected. This assignment is also sustained.

We think we have sufficiently indicated the lines along which this case should be tried. The original lease between Bell and the Kuhns and the notice mailed to G. B. Kuhn by Bell are both in writing. They are to be construed by the court, and the only question of fact involved, as we view the case, at least upon its presentation before us now, was whether or not the notice mailed by Bell was, or should have been, received by the person to whom it was addressed.

Judgment reversed and a new venire awarded.